■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v EDWIN R. MATEO, Respondent.—Appeal by the People from an order of the County Court, Nassau County (Ain, J.), dated March 4, 1985, which, after a hearing, granted those branches of the defendant's motion which were to suppress certain physical evidence and his statements to the police.

Order modified, on the law and the facts, by denying that branch of the defendant's motion which sought the suppression of physical evidence. As so modified, order affirmed, and matter remitted to the County Court, Nassau County, for further proceedings.

The record of the suppression hearing indicates that at 7:40 P.M., on December 28, 1983, three groups of police officers in unmarked vehicles had staked out the parking lot area of the Monte Carlo Diner in Westbury, New York. They were conducting a surveillance of the lot with the expectation that one Edwin Morales, a suspected narcotics dealer, would meet with a confidential informant in the lot and sell several ounces of cocaine to the informant.

At this time, Morales was observed walking toward the diner lot with the defendant walking some 10 to 20 feet behind him. Morales looked over his shoulder as they walked and appeared to briefly converse with the defendant, whereupon Morales walked on toward the diner lot and the defendant stopped and stood on the sidewalk with his hands in his jacket pockets. While Morales entered the informant's vehicle and negotiated a sale of cocaine, the defendant remained on the sidewalk and gazed steadily in the direction of the parking lot, even though it had started to rain and other people in the area were hurriedly seeking shelter from the inclement weather. When Morales exited the informant's vehicle in order to pick up the cocaine he had agreed to sell, the defendant slowly walked across the street to the rear of an alley which ran behind a restaurant facing the diner parking lot. Upon reaching the rear corner of the restaurant, the defendant bent down three or four times and peered around the corner of the building in the direction of the diner. His

hands remained in his pockets, and it appeared to the officers that he was "fooling around" with something in his right-hand pocket. After looking at the diner for three or four minutes, the defendant slowly walked back down to the street and crossed over in front of the diner. He then stood on his tiptoes at the edge of the parking lot and focused his gaze in the direction of the informant's vehicle. At this time, one of the officers broadcast a radio signal ordering the arrest of Morales, who had returned to the vehicle with a quantity of cocaine. When several officers converged upon the vehicle and arrested Morales, the defendant abruptly turned from the parking lot and began to walk away rapidly. Two members of the surveillance team then passed the defendant in their car, parked ahead of him, and exited their vehicle with guns drawn. They identified themselves as police officers and ordered the defendant to "freeze", and to remove his hands from his pockets. The defendant turned away and began to run in the opposite direction, but stopped when he saw other members of the surveillance team approaching from that direction. Despite repeated requests, the defendant refused to take his hands from his pockets; hence two of the officers forcibly removed his hands from his jacket pockets and placed him against a nearby building. The officers then conducted a pat-down frisk of the defendant's person and discovered a hand-gun and an ammunition clip in his jacket pockets. An address book was also discovered during the frisk. As the defendant was being searched, the two officers repeatedly questioned him and learned that he had been dropped off near the diner with his friend, Edwin Morales. The defendant was then placed in a police vehicle and advised of his rights. The hearing testimony established that all of the officers involved in the incident had extensive experience in conducting surveillances and investigations concerning narcotics offenses.

Based upon the foregoing evidence, the hearing court granted those branches of the defendant's motion which were to suppress physical evidence and his statements in their entirety, concluding that the police lacked both reasonable suspicion to stop the defendant and probable cause to arrest him.

Contrary to the conclusion of the hearing court, we find that, under the particular facts of this case, the police had reasonable suspicion to believe that the defendant was involved in criminal activity so as to justify his detention and a pat-down search of his person (see generally, People v King, 65 NY2d 702; People v Klass, 55 NY2d 821; People v Lewis, 108

AD2d 872; *People v Crosby*, 91 AD2d 20, *lv denied* 58 NY2d 974). Indeed, the officers personally observed the defendant arrive on the scene with Morales, who was the target of their investigation, and who spoke with the defendant before they separated. Despite the rainy weather, the defendant stood watch over the parking lot where the drug transaction was conducted, and changed his vantage point on two occasions in order to surreptitiously view the scene, while keeping his hands in his pockets and "fooling around" with something in his jacket. The defendant also stood on his tiptoes to enhance his observation of the scene. These circumstances, when viewed in light of the many years of training and experience of the officers *(see, People v Alexander,* 37 NY2d 202; *People v Balas,* 104 AD2d 1039), sufficed to give rise to a reasonable suspicion that the defendant was acting jointly with Morales in the illegal transaction, perhaps as a lookout or an armed enforcer. His attempted flight from the area upon the arrest of Morales further supports this conclusion *(see generally, People v King, supra; People v Chapman,* 103 AD2d 494; *People v Crosby, supra; People v Mayes,* 90 AD2d 879; *People v Casado,* 83 AD2d 385). Hence, the police had reasonable suspicion to justify the stop.

Moreover, we discern no impropriety in the officers' display of their weapons during the stop, as the mere use of a weapon to effectuate a temporary detention is not improper where the circumstances indicate that criminal activity is afoot and the situation may be dangerous *(see, People v Chestnut,* 51 NY2d 14, *cert denied* 449 US 1018; *People v Rose,* 108 AD2d 831; *People v Evans,* 106 AD2d 527; *People v Finlayson,* 76 AD2d 670, *lv denied* 51 NY2d 1011, *cert denied* 450 US 931). The defendant's suspicious conduct in watching the drug transaction while appearing to fidget with an item in his pocket, when combined with the reasonable inferences which the officers could draw from the surrounding circumstances and the judicially recognized fact that the drug trade often engenders situations of extreme violence and danger to law enforcement officers *(see, People v Broadie,* 37 NY2d 100, *cert denied* 423 US 950; *People v Soler,* 92 AD2d 280), justified the display of police weapons in this case. Similarly, the forcible removal of the defendant's hands from his pockets was proper in light of his refusal to voluntarily remove them and his attempted evasion of the officers *(see, People v Samuels,* 50 NY2d 1035, *cert denied* 449 US 984; *People v Love,* 92 AD2d 551), and we discern no constitutional infirmity in the manner in which the frisk was conducted *(see, e.g., People v Chestnut, supra).*

Furthermore, it is clear that once the pat down of the defendant revealed the presence of a handgun on his person, the police had probable cause to arrest him *(see generally, People v Lewis, supra; People v Horvath,* 108 AD2d 926; *People v Gray,* 90 AD2d 405), and to then conduct a search incident to the arrest *(see, e.g., People v Weintraub,* 35 NY2d 351). Hence, the hearing court erroneously suppressed the physical evidence seized from the defendant.

However, the record further reveals that after the discovery of the gun, the officers interrogated the defendant and elicited damaging statements from him to the effect that he had been dropped off near the diner with his friend Edwin Morales, without first apprising him of his rights pursuant to *Miranda v Arizona* (384 US 436). Since no emergency existed and the questioning by the police was both designed to elicit incriminating responses and conducted while the defendant was in custody, the defendant's statements must be suppressed *(see, People v Chapple,* 38 NY2d 112; *People v Shivers,* 21 NY2d 118). Mollen, P. J., Lazer, Thompson and Kunzeman, JJ., concur.